**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

JENNIFER DAVENPORT, ATTORNEY GENERAL OF NEW JERSEY,

*Plaintiff*,

v.

AMAZON.COM, INC.
410 Terry Ave N
Seattle, WA 98109

AMAZON.COM SERVICES, LLC
410 Terry Ave N
Seattle, WA 98109

AMAZON LOGISTICS, INC.
410 Terry Ave N
Seattle, WA 98109

*Defendants*.

No. 2:26-cv-09977-JXN-JSA

**COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

**Page**


**I. Nature of the Case .......... 1**

**II. Parties .......... 9**

**III. Jurisdiction, Venue, and Commerce .......... 10**

**IV. Amazon's Delivery Service Partner Program Creates Monopsony Power .......... 11**

A. Amazon Launches the DSP Program, Creating a Captive Seller. .......... 12

B. Amazon Controls DSPs to Maintain Its Monopsony .......... 14

C. Through the DSPs, Amazon Controls the DSP Delivery Drivers. .......... 18

**V. Neither DSPs nor Their Drivers Have Reasonable Alternatives to Serving Amazon .......... 20**

**VI. Amazon Exercises Monopsony Power by Imposing Substandard Compensation and Terms on DSPs and DSP Employees .......... 23**

A. Amazon Imposes Monopsony Power on Drivers Through the DSPs. .......... 23

B. DSPs Impose Amazon's Monopsony Power on DSP Drivers. .......... 24

**VII. Amazon Dominance Prevents Competition That Would Limit Amazon's Power. .......... 25**

A. Amazon Suppresses Unions that Would Limit Amazon's Monopsony Power. .......... 25

1. Edison, New Jersey: The Threat of Termination .......... 26

2. Queens, New York: Escalation and Termination .......... 27

B. Amazon Restricts Inter-DSP Competition for Drivers. .......... 29

1. Amazon's No-Poaching Policy .......... 30

2. Amending the Written Policy Did Not Change the Practice. .......... 31

**VIII. Amazon Has Monopsony Power in the DSP Services Markets. .......... 33**

A. Direct Evidence of Amazon's Monopsony Power in the DSP Services Market .......... 34

B. Indirect Evidence of Amazon's Monopsony Power in the DSP Services Markets .......... 34

1. DSP Services Are a Relevant Service Market. .......... 34

2. New Jersey Is a Relevant Geographic Market. .......... 35

3. The New York-Newark-Jersey City Metropolitan Statistical Area (MSA) is a Relevant Geographic Market .......... 36

4. Amazon's Market Share of DSP Services Market in Both Geographic Markets Establishes Its Monopsony Power. .......... 36

**IX. Even Under a Broader Market Definition of Last-Mile Delivery Services, Amazon Has Buyer Market Power. .......... 37**

**X. Amazon Has Buyer Market Power in the Labor Market for DSP Drivers.............. 37**

A. Direct Evidence of Amazon's Market Power in the New Jersey Labor Market for DSP Drivers in the Relevant Geographic Markets........................................... 38

B. Indirect Evidence of Amazon's Market Power in the New Jersey Labor Market for DSP Drivers............................................................................................. 39

1. DSP Drivers Are a Relevant Labor Market .................................................. 39

2. New Jersey and the New York-Newark Jersey City MSA Are Relevant Geographic Markets........................................................................................ 40

3. Amazon's Market Share in the DSP-Drivers Labor Market Establishes Its Market Power.............................................................................................. 40

**XI. Amazon's Conduct Has Many Anticompetitive Effects and Continues to Have Ongoing Impact.......................................................................................................... 41**

**XII. Causes of Action.......................................................................................................... 43**

Count I: Monopsonization of the DSP Services Market in Both Relevant Geographic Markets under Section 2 of the Sherman Act ............................ 43

Count II: Attempted Monopsonization of the Last-Mile Delivery Services Markets in the Relevant Geographic Markets Under Section 2 of the Sherman Act (In the Alternative)......................................................................................... 44

Count III: Unreasonable Restraint of Trade in the DSP Services Market in the Relevant Geographic Markets Under Section 1 of the Sherman Act ............. 44

Count IV: Unreasonable Restraint of Trade in the DSP Drivers Labor Market in the Relevant Geographic Markets Under Section 1 of the Sherman Act – No-Poach.............................................................................................................. 45

Count V: Violations of the New Jersey Antitrust Act .................................................... 46

**XIII. Prayer for Relief.......................................................................................................... 47**

**XIII. Demand for Jury Trial ................................................................................................ 48**

# COMPLAINT

## I. Nature of the Case

1. Amazon, formally defined in this case as Amazon.com, Inc., along with its subsidiaries Amazon.com Services, LLC and Amazon Logistics, Inc., has orchestrated a deliberate and unlawful scheme to harm thousands of New Jersey workers, who are forced to work under grueling and often inhumane conditions, through its creation of and control over businesses called Delivery Service Partners ("DSPs") that provide delivery services to Amazon. This lawsuit seeks to hold Amazon accountable for abusing its dominant buyer power, known as monopsony power, over DSPs and their driver employees (referred to within Amazon as "Delivery Associates" or "DAs"), resulting in lower wages and worse working conditions and causing pervasive harm to everyday workers in New Jersey—and likely across the country—who provide the delivery services Amazon demands.

2. Amazon is a monopsonist. A monopsonist is a dominant buyer of specific goods or services that can control or dictate the terms of payment for the services it demands. A monopsonist can pay its suppliers (or workers) less and subject them to worse conditions because the sellers (or workers) lack alternative purchasers for their goods and services.

3. Amazon intentionally developed and implemented a delivery program over which it possesses and abuses its monopsony power. Amazon's self-designed DSP program imposes Program Policies and practices that govern the terms under which Amazon purchases DSP delivery services. These Policies and practices, as discussed below, prioritize Amazon's corporate profits over worker welfare.

4. DSPs contract with Amazon to deliver packages to consumers' homes through DSP driver employees. But DSPs are not true independent businesses that can resist Amazon's demands. Rather, Amazon created DSPs to be creatures of Amazon, wholly beholden to, and the

vehicle through which Amazon imposes its monopsony power on delivery drivers. DSPs must rely on Amazon for various assets and infrastructure, including the process for assigning packages and designing delivery routes. To serve any other potential customer, a DSP would need to re-create that infrastructure, including having its own unbranded vans and its own route software. Further, Amazon tries to keep DSPs relatively small to limit their bargaining power. DSP owners are more like middle managers than truly independent business owners.

5. Amazon designed the DSP Program to specifically target and recruit DSP drivers who have limited comparable job opportunities. This Program enables it to maintain its monopsony power. Amazon's internal documents make clear that it evaluates DSP hiring conditions by measuring unemployment and the availability of workers in jobs with similar or lower pay and/or comparable physical demands. These individuals often lack access to employment opportunities offering steady compensation, meaning they have few other options. Positions with the United States Postal Service ("USPS"), United Parcel Service ("UPS"), and Federal Express ("FedEx") (together, "traditional delivery services") are "golden ticket" jobs for DSP drivers. A DSP driver cannot simply decide to work for an alternative employer; the employer must be hiring when the driver is looking and must select the DSP driver. Therefore, few DSP drivers have a reasonable possibility of securing employment with these alternative delivery services. Gig alternatives, such as Uber or Lyft, do not offer the certainty of hours or employment to be sufficient alternatives to working as a DSP driver.

6. As a result, Amazon does not fear that its DSP drivers will have the opportunity to switch to other employers and does not have to improve DSP drivers' compensation or working conditions to keep them as DSP drivers. Rather, Amazon worries it will exhaust the supply of workers willing to accept the low wages and poor conditions, which it tracks as a risk of

"deplet[ing] the available labor supply" of these targeted workers within a given geography. Amazon models when a local labor pool is becoming saturated—when hiring and turnover in an area will no longer produce enough replacement workers willing to work at the wages and under the conditions Amazon sets. In other words, Amazon's concern is not that competition will force it to pay more; it is that it will run out of workers to use up.

7. In economic terms, Amazon is the sole buyer in the market for DSP services and, through its DSPs, the sole employer in the market for DSP drivers. In legal terms, the market for DSP services and the labor of DSP drivers are each a relevant antitrust market, and Amazon has monopsony power in each market, as explained in detail below. As effectively the only buyer in these markets, Amazon exercises its power through the low compensation and poor conditions it imposes on both DSPs and DSP drivers. DSP drivers earn significantly less than delivery drivers for UPS, FedEx and the United States Postal Service. Further, DSP drivers themselves have called their conditions "atrocities," as drivers must meet inhumane demands—for instance, urinating in water bottles during their shifts because of the high delivery requirements. They must accept invasive surveillance that monitors their every moment and action while at work and face the possibility of immediate termination for the smallest infraction or failure to meet these unreasonable requirements. Indeed, if they do anything Amazon does not like—including engaging in any kind of pro-union activity—Amazon can effectively end their employment not just at one DSP, but at all of them. Amazon can act with such impunity because of the monopsony power it possesses.

8. According to one report, Amazon DSP workers suffered injuries causing lost time at work at more than twice the rate of non-Amazon delivery workers.[1]

---

[1] The Strategic Organizing Center, *The Worst Mile: Production Pressure and the Injury Crisis in Amazon's Delivery System* 8 (May 2022), https://thesoc.org/wp-content/uploads/sites/342/The-Worst-Mile-1.pdf.

**FIGURE 2:** Injury Rates by Injury Category for Amazon Delivery System, Amazon DSPs, and Non-Amazon Delivery, 2021




9. New Jersey brings this action because Amazon has and continues to embark on a multifaceted and illegal strategy to maintain its monopsony power. By maintaining such power, Amazon can do what it pleases with respect to compensation for DSP services, as well as maintaining inhumane working conditions.

10. Amazon's illegal strategy has two core aims.

11. First, Amazon uses a range of anticompetitive tactics, through its control over the DSPs, to crush any prospect of DSP worker unionization. A DSP driver's union would collectively bargain for better compensation and working conditions that would reflect the actual value of the services they provide to Amazon. Amazon fears unionization because, if successful, it would force Amazon to pay more competitive rates and make workplace improvements. If the DSPs in one

geographic area were to successfully unionize, Amazon fears that, upon information and belief, DSP driver unionization would rapidly spread across the country due to the benefits that unionized workers would likely secure.

12. Amazon obligates DSPs, under threats of termination from the Program and litigation, to (i) prohibit their drivers from circulating any kind of unionization materials, (ii) adopt and enforce at-will employment policies for drivers that hinder unionization, and (iii) comply with Amazon's hired "help" to stop unionization efforts. DSPs that oppose any of these policies risk destruction of their business and harassing litigation from Amazon.

13. Amazon has made good on its threats and policies. It has repeatedly punished DSP drivers who have attempted to unionize. Amazon maintains lists of employees that are ineligible for re-hire throughout its facilities and by DSPs. DSP drivers understand that union organizing or union support leads to placement on that list or mandates that their working hours be reduced. Amazon has also terminated DSPs from its Program after drivers within those DSPs attempted to unionize. Amazon also meticulously tracks evidence of pro-union sentiment with remarkable scrutiny—quantifiably tracking all "internal incidents" even as benign as "an employee comment or a flyer found inside a[n Amazon] site." Amazon abuses its position as a technological behemoth, with near-unlimited resources, infrastructure, and technological capabilities to track, intimidate, and suppress DSP drivers who seek to unionize, including, upon information and belief, even taking and analyzing surveillance videos of those who even attempt to exercise their rights.

14. Most recently, in March of this year, a DSP in Edison, New Jersey, warned its drivers that Amazon would terminate its relationship with the DSP if its drivers attempted to unionize, which would effectively shut down the entire DSP that employs the drivers. Such an act would likely destroy the DSP's business. This threat follows Amazon's termination of a DSP in

Queens in response to attempts by workers to unionize. The termination of the Queens DSP reportedly resulted in more than 150 drivers being fired.

15. Second, to maintain its monopsony power, Amazon has inhibited or otherwise prevented DSPs from competing for drivers at other DSPs. That is because, if DSPs were permitted to recruit workers from other DSPs, those DSPs that gain in size and importance could potentially negotiate more competitive compensation and terms from Amazon for the services Amazon demands.

16. Amazon has taken specific steps to prevent this possibility, implicitly and explicitly limiting the ability of DSPs to recruit drivers from other DSPs—a form of a no-poach agreement. Initially, Amazon instituted and enforced a policy that implicitly prevented DSPs from recruiting drivers from other DSPs. From at least June 2020 to March 2021, Amazon made that policy explicit and required all DSPs nationwide to notify another DSP if it was considering an offer of employment to that DSP's employee. Amazon implemented this requirement in its June 2020 Operations Manual, which stated: "DSPs or their employees must not actively seek out DAs from other DSPs to offer employment opportunities at their company (poaching)."

17. The June 2020 Operations Manual further stated: "When a DSP is considering an offer to a [Delivery Associate] currently employed [by another DSP] at the same station, the DSP employing the DA <u>must</u> be contacted to ensure the owner is aware that the DA had approached another DSP about an opportunity." Amazon wanted "the original DSP [to] understand that the driver approached [the offering DSP], and not the other way around." Amazon's policy brazenly disregarded the law that prohibits competing employers, in this case DSPs, from coordinating on offers of employment. Instead, Amazon prohibited DSPs from making the first move to recruit an

employee from another DSP and defined the "acceptable" circumstances when DSPs could recruit from their competitors.

18. After Amazon realized that its no-poach policy plainly violated antitrust laws, it decided to change the paper record rather than the practice. In August 2021, over a year after Amazon changed the written policy, an Amazon manager internally explained that the manual "used to have specific 'anti poaching' language," but that the language had been removed and replaced with guidance that Amazon "can't restrict movement/recruiting." Disturbingly, the manager added that "the updated policies don't really have any teeth to prevent this."

19. The no-poach agreement, however, remained in effect, enforced by Amazon managers well after the formal change in the policy's language. In October 2022, one Amazon business coach wrote: "The poaching DSP offered 10 hours guaranteed pay and [the poached-from DSP] could not match. I have addressed with the poaching DSP and that will not happen again in the future." Even as late as September 2024, Amazon was fully aware of ongoing efforts to implement or enforce no-poach agreements between DSPs that its own policies had at least encouraged, if not required, since at least 2018.

20. Amazon's strategies and related conduct to prevent unionization and DSP-to-DSP hiring practices violate antitrust laws, including both Section 1 and Section 2 of the Sherman Act as well as the New Jersey Antitrust Act, which are intended to prevent these kinds of anticompetitive behavior. In a competitive market, Amazon would not be able to unilaterally set the terms and conditions associated with the purchase of DSP services, and DSPs would be free to recruit whomever they wish without Amazon's interference. As a result of this conduct, Amazon delivery drivers are subject to financial, physical, and mental harm, illustrating the real, everyday impact of an unchecked monopsonist. This Court's intervention is necessary to protect (i) these

workers from a system that Amazon specifically designed to preserve its ability to underpay and abuse drivers without consequence and (ii) DSP entities from business destruction for opposing Amazon's policies.

21. Plaintiff intends to seek preliminary injunctive relief to protect the status quo, prohibit Amazon from terminating, or threatening to terminate, additional DSPs to prevent unionization in New Jersey and the New-York-Newark-Jersey City MSA and to prevent irreparable harm that would befall the DSPs. This relief targets a limited geographic area and addresses only harms that are imminent, substantial, and irreparable. The preliminary relief would maintain the status quo by preventing Amazon from terminating DSPs and their workers pending a full determination of the merits:

a. Amazon's pattern of DSP termination following union activity demonstrates that Amazon will destroy businesses that resist its anticompetitive policies before any legal remedy can be issued.

b. Amazon's use of ubiquitous technological surveillance infrastructure creates an inevitable threat that Amazon will discover organizing activity and act on that basis.

c. Amazon's pattern of pretextual terminations masked as "performance issues" after detecting union activity means that DSPs and drivers cannot wait for trial to obtain relief.

22. Amazon has been keenly aware of the threat unionization poses to their monopsony in New Jersey and the immediate surrounding area. Amazon has taken specific steps to prevent a scenario that could challenge its buyer power in the State. Absent preliminary injunctive relief, Amazon will continue to eliminate DSPs and drivers who resist its monopsony, mooting any ultimate judgment in this case.

23. Plaintiff also seeks treble damages for the compensation DSPs and DSP drivers would have earned for their services in the absence of Amazon's anticompetitive conduct, permanent injunctive relief to stop Amazon's anticompetitive conduct, as well as any further relief, both at law and in equity, to which the State may be justly entitled.

## II. Parties

24. Plaintiff is the Attorney General, who brings this action in her capacity as the State's chief legal officer on behalf of the people of the State of New Jersey to protect the State, its general economy, and its residents from Amazon's unlawful practices. Defendants' actions complained of herein have harmed, and continue to harm, competition, consumers, and the general welfare and economy of the State of New Jersey. The Attorney General of the State of New Jersey brings this action pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; Sections 4c and 16 of the Clayton Act, 15 U.S.C. §§ 15c and 26; the New Jersey Antitrust Act, N.J. Stat. Ann. §§ 56:9-6, 56:9-10(a), and 56:9-12(b); and the common law.

25. Defendant Amazon.com, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of Washington. Amazon.com, Inc. engages in business across the United States and the State of New Jersey. Amazon.com, Inc. wholly owns and operates Amazon.com Services LLC.

26. Defendant Amazon.com Services LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in the State of Washington. Amazon.com Services LLC engages in business across the United States and in the State of New Jersey. Amazon.com Services LLC manages key e-commerce operations within Amazon, including logistics and fulfillment.

27. Defendant Amazon Logistics, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of Washington. Amazon

Logistics, Inc. operates the DSP Program and enforces the contract terms, rules, and regulations associated with the Program. Amazon Logistics, Inc. does business in New Jersey and engages in business across the United States. Upon information and belief, Amazon.com., Inc. wholly owns and operates Amazon Logistics, Inc., either directly or through Amazon.com Services, LLC. Amazon Logistics, Inc. manages last-mile delivery services for Amazon, including contracting with DSPs and overseeing their services.

## III. Jurisdiction, Venue, and Commerce

28. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a). The Court has supplemental jurisdiction of the State's state law and common law claims under 28 U.S.C. § 1367(a).

29. This Court has personal jurisdiction over Amazon under Section 12 of the Clayton Act, 15 U.S.C. § 22, and Federal Rule of Civil Procedure 4(k)(1)(C) because Amazon transacts business and is found within this District, is properly served, and has substantial contacts with the United States.

30. This Court also has personal jurisdiction under Federal Rule of Civil Procedure 4(k)(1)(A) because Amazon is properly served and is subject to the jurisdiction of New Jersey courts under N.J. Stat. Ann. § 4:4-4. The allegations in this action are a direct result of Amazon's operations within the State of New Jersey, including Amazon's last-mile delivery and fulfillment operations and Amazon's contractual relationship with DSPs within the State.

31. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)(1) and (2) because Defendants transact business in this District and a substantial part of the events giving rise to Plaintiff's claims occurred in this District, including Defendants' last-mile delivery and fulfillment operations and their contracting and dealings with DSPs and DSP drivers in New Jersey.

32. Amazon engages in, and its activities substantially affect, interstate trade and commerce as those terms are used in 15 U.S.C. §§ 1 and 2. Amazon sells and distributes goods and services throughout the United States, including across State lines and into New Jersey. Amazon operates fulfillment and delivery networks that involve interstate shipments, and it contracts with DSPs and engages drivers in New Jersey as part of that interstate system. Amazon purchases the services of thousands of New Jersey residents who then deliver its goods and services in New Jersey and its sister States.

33. New Jersey hosts multiple Amazon fulfillment centers, including major facilities in Robbinsville, Carteret, Edison, and Avenel, which collectively employ thousands of workers and handle substantial volumes of Amazon's logistical operations. The State understands that at least 14,000 DSP drivers in New Jersey are impacted by Amazon's conduct. Amazon's multifaceted scheme directly suppresses wages in the DSP Services Market and limits worker mobility, harming both individual workers and the State's economy.

## IV. Amazon's Delivery Service Partner Program Creates Monopsony Power.

34. Amazon is known for its e-commerce platform, brick-and-mortar grocery stores, film and television production, consumer electronics manufacturing, cloud computing services, satellite internet services, and more. Less well known, but dominant, is its logistic services division, which fulfills and delivers orders placed on its e-retail platform.

35. Prior to 2018, when Amazon shipped a relatively small number of packages, Amazon primarily relied on UPS, FedEx, and USPS, known as "last-mile delivery" services, to deliver packages to its customers. From 2013 to 2018, the number of packages Amazon shipped doubled in the U.S. and has doubled again since 2018. Amazon's massive package delivery requirements have allowed it to create its own internal delivery system, a system that creates—and allows Amazon to exploit—its power as a buyer of package delivery services.

36. Last-mile delivery services are one of the most complex aspects of supply-chain management. The millions of households receiving deliveries are geographically dispersed. Complex routes, local urban congestion, parking scarcity, and rural sparsity create unique challenges to deliver packages quickly and efficiently.

### A. Amazon Launches the DSP Program, Creating a Captive Seller.

37. Amazon used its power as a buyer to create an entirely new logistics chain that establishes and allows it to exploit its buyer power. First, in 2015, Amazon created Amazon Flex, a gig work-based model similar to Uber, DoorDash, or Instacart. Amazon Flex pays nominally independent contractors[2] to perform last-mile delivery services using the contractors' own vehicles. Amazon advertises this program as "a flexible way of earning extra money on [a driver's] own schedule."

38. With more projected growth in the future, Amazon announced the launch of the DSP program in June 2018. By this point, Amazon Logistics handled nearly a billion packages per year with an expectation that the number would continue to increase. Amazon's then-Senior Vice President of World-Wide Operations, Dave Clark, stated at the time, "We need to build more of our own capacity." Despite this stated need, Amazon expanded by creating a network of thousands of separately owned and organized DSPs to provide last-mile delivery services for Amazon.

39. Amazon operates the DSP program to directly control a large, captured last-mile delivery workforce through nominally separate companies that are between itself and the drivers performing the work that Amazon demands. Amazon's public-facing and internal media-response materials show that the separation functions to shield Amazon from the costs and liabilities

[2] The classification of Amazon Flex drivers as independent contractors is a matter of contention in a separate, unrelated action brought by the New Jersey Department of Labor and Workforce Development. *See* Complaint and Jury Demand, *Asaro-Angelo v. Amazon.com*, ESX-L-008049-25, N.J. Super. Ct. Law Div. Essex Cnty. (Oct. 20, 2025).

associated with direct employment. From Amazon's perspective, DSPs bear the maximum risk of tort liability. The DSP program protects Amazon from risks and lowers its costs at the expense of the DSPs and their drivers. Further, Amazon's rates and operating requirements sharply limit the DSPs' ability to compete for drivers through better wages or working conditions—an outcome made possible by Amazon's monopsony power.

40. Publicly, Amazon claims it created the DSP program "to share our experience in operations and logistics with aspiring entrepreneurs." The program shields Amazon from liability that occurs during deliveries, such as death and injury, shifting the risk to the DSP and making it less attractive to entrepreneurs. According to one such entrepreneur in June 2020, Amazon shifts liability to the DSPs for driver injuries and workers' compensation, property damage during last-mile delivery, damage to the Amazon-branded vehicles required to be used by the DSPs, and lost business from adverse weather events, all while DSP owners are required to function under strict limitations on their profitability and conditions entirely at the discretion of Amazon itself.

41. Amazon's response to this critique was not to adjust any of its program terms—the mark of a monopsonist with no reason or competitive pressure to do so. Rather, it held internal discussions and reframed its marketing of the DSP program away from "Entrepreneurs," a term that is likely to attract independent individuals who thrive in high-risk, high-reward ventures and towards "Owner/Operators," because entrepreneurs were "clearly not a good fit." Amazon recently described DSP ownership as an opportunity to become "the owner-operator of your own business," not mentioning entrepreneurship. Whereas entrepreneurs wish to expand and scale their businesses or develop an entity that could be sold for profit, owner-operators act as the manager for their small business, necessary to run the daily operations. Effectively, Amazon has designed the Program such that DSPs are middle managers by another name.

42. In the first year of operations, Amazon signed nearly 180 DSPs. The program expanded rapidly, and by 2024, Amazon had grown the network of DSPs to 4,400, operating across 19 different countries. Today, Amazon delivers the vast majority of its packages through DSPs.

**B. Amazon Controls DSPs to Maintain Its Monopsony.**

43. Amazon's Delivery Service Partner Program is a pivotal component of the company's last-mile delivery strategy. Amazon recruits "independent contractors" to deliver Amazon packages. Each DSP is an individually registered legal entity that contracts with Amazon for the delivery of packages.

44. A DSP signs a 12-month agreement that auto-renews. Amazon may terminate for breach on 30 days' notice. If Amazon terminates or declines to renew, "[Amazon] will not be liable for any severance payment [or] penalty[…]." Amazon receives all the DSP's data on termination. The DSP also needs Amazon's consent to assign their agreements.

45. Amazon additionally prohibits DSP owners from owning any stake in multiple DSP entities. In reorganizing the DSP program from "DSP 1.0," under which there were fewer restrictions on DSPs, to "DSP 2.0," Amazon sought to ensure that DSPs could not resist Amazon's monopsony power. As one internal document stated, the purpose of changing to DSP 2.0 was "De-risking [the Amazon Logistics] Network." As the basis for this, the document stated, "Recruiting a diverse network of smaller partners decreases our reliance on large partners and their ability to influence pricing and policies . . . DSP 2.0 partners are smaller in scale (12% of typical large DSP 1.0) and are relatively easy to replace should they exit, while lacking the scale to dictate terms."

46. Amazon's goal is to have an entire class of workers and DSP legal entities wholly dependent on Amazon's workflow under the terms that Amazon mandates. Amazon maintains near-absolute control over DSPs and their drivers through rigid enforcement of contractual terms,

"suggestions" made by Amazon-imposed business coaches, and the Operations Manual, all of which are functionally mandates.

47. Amazon bases DSP compensation on: 1) a monthly base rate paid per vehicle, based on the size of the fleet that Amazon itself determines a DSP needs, with this size subject to change each month; 2) a weekly hourly base rate based not on the hours actually worked, but on the hours that Amazon estimates the assigned routes will take; 3) an additional payment paid per successfully delivered package; and 4) a fuel allowance paid directly to a DSP's fuel card vendor. Because the first three factors are all dependent upon the routes that Amazon assigns to a DSP, each DSP's profitability is squarely within Amazon's discretion. As of 2023, approximately one in four DSPs failed to meet the profit range that Amazon advertised to potential DSP owners.

48. DSPs commonly lease and utilize Amazon-branded trucks and vans, and the DSPs' employees wear Amazon-branded clothing. Amazon imposes the terms and conditions for those leases. Although the DSP is responsible for the rates and compliance with lease terms, Amazon prohibits DSPs from using the vans for anything other than delivering Amazon packages. Further, if a DSP is terminated or quits the program, that DSP must return the vehicles. Amazon even reserves the right to terminate a DSP's use of branded vans "at any time and for any reason." Similarly, employees wearing Amazon uniforms may deliver only Amazon packages. To the customer, there is no discernible difference between a DSP employee and an Amazon employee.

49. The overwhelming majority of DSPs exclusively deliver Amazon packages, and Amazon knows that canceling its contract with a DSP will functionally destroy the business and the DSP owner's investment. Amazon's level of infiltration, integration, and control over DSPs' operations is indispensable; a DSP cannot survive the process of extracting itself from Amazon's infrastructure.

50. Each DSP must sign the Delivery Service Partner Program Agreement with Amazon Logistics. This binding contract incorporates Program Policies by reference. Among those terms, Amazon requires all DSPs to maintain an at-will employment policy for DSP drivers, which, by its terms, prevents a DSP from allowing workers to unionize, coupled with an anti-solicitation policy that prohibits the distribution of unionization materials. This "yellow-dog contract" functionally prohibits DSPs from employing unionized drivers and prohibits DSP employees from even attempting to organize a union.

51. Each DSP also receives "The Operations Manual." This almost-300-page instructional document for DSPs contains both contractually binding program policies, as well as optional advisory guidance. Amazon audits its DSPs for compliance with program policies; failure to comply with program policies may result in termination of a DSP contract. The Operations Manual, however, does not clearly distinguish which of its terms are binding policies and which are mere advisory guidance. This ambiguity further illustrates Amazon's monopsony power: in a competitive market, suppliers would be able to effectively demand transparency as to which program terms and conditions are contractually binding and thus effectively required for the DSP's business to survive.

52. In May 2019, Amazon imposed an arbitration and class-waiver requirement on the DSPs and on their drivers alike: each DSP must agree to arbitration with a class-action waiver, and Amazon requires each DSP driver, as a condition of employment, to sign an arbitration agreement with its DSP containing a class-action waiver. Together, these requirements foreclose both the small businesses in Amazon's delivery network and the drivers they employ from seeking collective relief against Amazon.

53. Amazon assigns a Business Coach to each DSP. Business Coaches are employees of Amazon, not the DSP, who act as liaisons and intermediaries between the DSPs and Amazon. Business Coaches oversee DSP onboarding, compliance, and quality assurance of DSP services. They also serve as an early warning system to report potential union activity.

54. DSPs are beholden to Amazon. Amazon automates and runs many aspects of the DSP's business operations. Amazon largely controls the hiring and training process. For example, Amazon assigns packages and routes through the Amazon Flex app to individual drivers employed by the DSP and unilaterally sets performance goals and ratings for DSP drivers. Market Intelligence maps the nearby labor pool from which DSPs will hire drivers. Amazon controls all these functions. The DSP can access such systems only in connection with providing delivery services to Amazon. This division limits DSPs' ability to provide their services to any buyer but Amazon.

55. Amazon also has constant control of the DSPs' vehicles—literally. An internal Amazon portal allows the company to perform "bulk actions like station transfers, activation, de-activation, and grounding or ungrounding" of Amazon fleet vehicles.

56. DSPs must use an Amazon-approved payroll system, currently ADP or Paycom, unless Amazon consents to an alternative. Amazon has direct access to the compensation data through those systems and can pull reports on driver pay for all DSP employees.

57. Because DSPs depend on Amazon for critical business infrastructure, Amazon is the only potential purchaser of DSP services. A DSP would need to replicate that business structure, essentially creating a separate business, to deliver packages for anyone besides Amazon. It would need a second set of vans and employees, its own software or logistical systems, and hiring and training processes to be able to serve any customer besides Amazon. Amazon created a

system in which it is the only buyer—the quintessential monopsonist—whereas traditional delivery services, such as FedEx and UPS, serve a much wider audience.

### C. Through the DSPs, Amazon Controls the DSP Delivery Drivers.

58. As a monopsonist, Amazon's control extends beyond the DSPs to the drivers that DSPs employ. Drivers begin their day in Amazon's app and end it with Amazon's score on the same app. Drivers report through Amazon software, drive Amazon-branded rented vans, follow Amazon-designed routes, receive Amazon performance scores, and face discipline driven by Amazon's rules.

59. Amazon oversees DSPs' hiring through the DSP job hub, an Amazon website where most hiring occurs for the program. According to drivers, applications for Delivery Associates appear to be for a job at Amazon itself, not a DSP contractor. Amazon must approve every DSP hire, and candidates who are invited to attend Delivery Associates job fairs or hiring events are not informed of the name of the DSP where they will be nominally employed until the hiring decision has been made. Amazon exercises little discernment in hiring generally but will arbitrarily apply stringent standards on drivers attempting to work at a new DSP if they have been labeled as union "agitators" at their prior DSP.

60. Moreover, Amazon can prevent and has directly prevented a DSP employee from working for a DSP even without that DSP's permission or knowledge, and has done so. Indeed while Amazon claims that DSP employment decisions are within the purview of the individual DSPs, Amazon maintains the ability to offboard any potential employee currently in the onboarding pipeline. Amazon maintains lists of former DSP employees that are not eligible to be rehired and will prevent their employment with a DSP if they are in the onboarding pipeline.

61. Amazon's control over DSPs and their employees does not end with the hiring decision. Amazon exercises control over DSP employees once they are onboarded and can suspend

DSP drivers against the express intent of the DSPs. For example, in November 2024, an anti-union consultant hired by Amazon used a homophobic epithet against a DSP driver. Later that evening, the DSP told the driver he would be suspended while the incident was investigated. The DSP cleared the driver to return the following day, but Amazon security continued to bar him from working for approximately two weeks.

62. Amazon also tracks lateral driver movement between DSPs. Amazon's Concierge Dashboard records each driver's last delivery date, "where these drivers have gone," and the gap between a driver's last route at one DSP and the first route at the next. Amazon, but not the DSPs themselves, can see drivers that switch to a different DSP and how quickly the transition occurs. Thus, Amazon can directly monitor whether—and where—there is competition for drivers amongst DSPs.

63. Amazon also dictates every aspect of a driver's performance. In addition to determining the assignment of routes to DSP drivers, Amazon records and observes metrics for each driver, which are used to determine if drivers should be penalized or terminated. If drivers do not achieve certain performance metrics, they can lose routes and thereby lose compensation.

64. Amazon engages in constant surveillance of DSP drivers using artificial intelligence-powered cameras installed in delivery vehicles. These cameras record and report any potential infractions committed by a driver, despite the lack of any clear policy communicating what exactly constitutes an infraction. Further, Amazon uses this ambiguous policy to punish DSP drivers who challenge its monopsony power by, for instance, attempting to unionize with their fellow drivers.

65. Surveillance is not limited to cameras in delivery vehicles; Amazon has gone so far as to deploy drones to record and surveil DSP drivers attempting to strike, such as the drivers who

attempted to unionize in Queens, New York, as discussed below. These drones took to the sky to record the participants of the strike—footage which Amazon then used to identify and blacklist participating drivers. It was also reported that Amazon stationed extra security cameras at its facility in Queens in anticipation of the strike.

**V. Neither DSPs nor Their Drivers Have Reasonable Alternatives to Serving Amazon.**

66. DSPs have little leverage against these rules, consistent with a monopsonized marketplace in which the sellers of services have little-to-no viable competitive alternatives. Because losing the Amazon contract likely means the end of the business, DSPs cannot meaningfully resist Amazon's compensation-information restrictions, anti-union requirements, or other driver-facing policies. DSPs are captive agents through which Amazon enforces the terms it designs.

67. DSPs depend on Amazon for both their services and the operating infrastructure that Amazon provides. Many have no customers other than Amazon and no independent delivery volume. If a DSP wanted to source to a non-Amazon buyer, it would need its own vehicles, software to manage scheduling and delivery, and payroll processing system.

68. UPS and the U.S. Postal Service do not rely on independent contractors for their core business, and DSPs do not have the infrastructure needed to operate at the capacity that FedEx requires of its contractors. For example, a FedEx ISP business requires a $300,000 to $1.5 million investment to acquire, compared to $30,000 in liquid assets and roughly $10,000 in startup costs for a DSP business. In part, the costs are higher because the FedEx ISP must purchase a route. To become an ISP, an Amazon DSP would likely have to buy a new fleet of delivery vehicles because the Amazon vehicles that most DSPs use can be driven only to deliver Amazon packages. As a result, none of these traditional delivery services are reasonable alternative customers for a DSP.

69. Amazon terminated—or, as Amazon puts it, "involuntary[il]y exit[ed]"—its contracts with 116 DSPs in 2023 alone on accelerated 14-day-or-same-day timelines, with conditional separation payments. Upon information and belief, termination inevitably results in dissolution of the DSP.

70. Like their DSP employer, DSP drivers have no reasonable alternatives to their existing jobs. Drivers that pursue employment with DSPs prioritize regular, full-time work, which is typically unavailable to them elsewhere. Amazon attracts applicants with the promise of a 40-hour work week while maintaining its power over these workers through its policies, practices, and a pervasive culture of fear. The drivers value immediate start dates as opposed to delay between time of recruitment by Amazon and beginning work.

71. Amazon has few parameters for driver eligibility. An applicant must be 21 years old and have a valid driver's license; pass a background check, the criteria of which Amazon does not specify; pass a motor-vehicle-record check; and pass a four-panel drug test (opioids, phencyclidine/PCP, cocaine, and amphetamines). Most drivers do not need a commercial driver's license.

72. Working for other last-mile delivery providers is not a reasonable alternative. UPS, FedEx Ground, and the U.S. Postal Service hire for positions that deliver packages, but the labor arrangement is fundamentally different. Critically, for workers Amazon recruits, hiring channels at traditional delivery services are different from Amazon and present unique challenges. USPS and UPS have different hiring processes that create barriers for Amazon DSP drivers; both are unionized, and USPS is a civil service system with its own requirements and procedure. Even if these companies, individually or together, were an option for DSP drivers, that option is only meaningful if the employer is hiring when a DSP driver is looking for work and the employer

selects the DSP driver. Furthermore, traditional delivery services do not hire enough new delivery drivers to be a competitive constraint on Amazon's buyer power.

73. Although UPS will, at times, hire seasonal delivery drivers, these jobs are substantially limited and not permanent. Under the national UPS collective bargaining agreement, UPS may only hire seasonal employees between November 15th and December 26th, and priority for seasonal driving positions is given to existing part-time employees and other "temporary cover" drivers (employees with non-driving positions who may fill in as drivers as needed).

74. For drivers with competing last-mile delivery providers, the time between hiring and start date can be long and uncertain. In contrast, DSP hiring occurs quickly. Many DSP drivers lack the means to wait out a more extended process; therefore, the DSP Program captures a differentiated class of workers from those who work in the "golden ticket" positions offered by traditional delivery services.

75. These same market factors explain why DSP drivers add gig work on top of their DSP work rather than switch from solely working for a DSP to solely gig work. DSP work and gig work serve different functions. DSP work offers more predictable hours and a more regular schedule. Further, unlike gig drivers, DSP drivers are not required to have or use their own vehicles.

76. Gig work is not a substitute for DSP drivers. DSP drivers do not commonly leave the DSP Services Market for Uber, Lyft, or DoorDash; they generally remain in the DSP job and add gig hours on the side. [redacted]

[redacted]

### VI. Amazon Exercises Monopsony Power by Imposing Substandard Compensation and Terms on DSPs and DSP Employees.

77. Because Amazon faces little to no competition when purchasing DSP services and in the hiring of DSP drivers, it can and does impose anticompetitive terms and compensation on DSPs. That, in turn, requires DSPs to suppress wages and impose worse working conditions on their drivers. Amazon imposes rates unilaterally, which stay flat while operating costs increase, leaving DSPs with thin margins. Amazon further imposes surprise fees and costs, such as bills for van repairs that can exceed $100,000.

#### A. Amazon Imposes Monopsony Power on Drivers Through the DSPs.

78. Amazon can and does assign lower-than-expected volumes of routes, as well as route variability, which affects DSP compensation. The DSP "scorecard" metrics, which Amazon uses to justify the number of routes given to each DSP, remain opaque to the DSPs themselves. One DSP owner stated, "In over a year of asking I have been unable to get a single person to 'show the work' on any single metric much less the integrated score card." This opacity operates in one direction, however, as the same DSP owner explained: "Amazon requires that they are able to audit me down to the length of my employee meal break but refuses to do even basic audits of our score card." Further, the metrics that Amazon imposes may themselves be contradictory. As another DSP owner stated, "I feel like I am in a constant rat race chasing my own tail with metrics that contradict each other (I.e. drive safe but you have to deliver 300 packages in 9 hours and take a lunch)."

79. Amazon micromanages DSPs—ostensibly independent businesses. DSPs are penalized for driver turnover, regardless of their basis for terminating an employee. In voicing a complaint to Amazon regarding the dismissal of unsafe or incapable employees, one DSP owner stated, "Amazon should not have a say in how we staff and utilize manpower."

**B. DSPs Impose Amazon's Monopsony Power on DSP Drivers.**

80. Whether wittingly or unwittingly, DSPs impose lower wages and worse conditions than if there was competition. DSP workers receive substandard compensation, and they must comply with unreasonable, and at times inhumane, conditions, accept imperious and byzantine oversight, and attend mandatory meetings without pay. To meet Amazon's grueling delivery requirements, DSP drivers must regularly relieve themselves using water bottles kept in their delivery vehicles. In 2022, Amazon drivers reported 709 heat-related illnesses, a massive increase from the 177 that occurred in 2021.

81. Further, DSP drivers legitimately fear that an act as ubiquitous as rolling through a stop sign could result in termination, despite their best efforts. DSP drivers fear that these "rules" are moving targets, as they can be unannounced, carry uncertain penalties, and are used as pretext to terminate a driver for an unrelated reason that Amazon does not wish to disclose, such as attempted unionization.

82. DSP drivers feel forced, trapped, or even subhuman and unworthy of better benefits. DSP drivers have described working conditions as "atrocities," "disgusting," "slave labor," "inhumane," and "subhuman." When a DSP raised vehicle-safety concerns, Amazon told the DSP that it still had to run the route. When the same DSP complained to Amazon's corporate ethics line, Amazon cut its routes.

## VII. Amazon Dominance Prevents Competition That Would Limit Amazon's Power.

83. The primary threats to Amazon's dominance over DSPs and their employees are unionization and worker mobility. First, absent Amazon's policies and actions, DSP drivers would have a fair opportunity to organize the DSP workforce. If faced with a true possibility of DSP organization, either Amazon would have to improve conditions for their workforce to convince workers not to unionize or DSP workers would unionize and could negotiate better terms and conditions of employment. In either event, Amazon would lose its power over DSPs and DSP drivers. Second, absent explicit and implicit policies that prevent DSPs from hiring drivers from each other, a DSP in need of drivers could offer better pay, and workers could switch employers. That competition at the DSP level would increase wages and reduce Amazon's ability to pay below-competitive levels for DSP services.

84. Instead, Amazon uses its power to prevent competition. Together, these restrictions, in conjunction with the anticompetitive conduct discussed below, maintain and enhance Amazon's monopsony power over Delivery Service Partners.

### A. Amazon Suppresses Unions that Would Limit Amazon's Monopsony Power.

85. Amazon's opposition to unions is well-known. Although Amazon is adamant that DSP drivers are not Amazon employees, it is nevertheless intent on preventing unions from forming at DSPs. Amazon launched a "Labor Incident Tracker" to "track and trend," among other things, "pro-Union behavior" with "a focus on [Amazon Associate] and [Driver Associate] impact." In considering a change to the DSP program, Amazon assessed the "Organizing Risk" of the proposed model explaining how shorter routes "generally mitigate[] risk" of workers unionizing. Amazon includes "regional union influence" in assessing new launch sites. Amazon also internally discusses unionization as a "risk," examining the possibility of union-related

protests near facilities, reviewing a "Protest Playbook," and anticipating "escalations" in response to activity.

86. Amazon tracks DSP drivers' attempts to unionize through its sophisticated surveillance apparatus. Amazon's recurring North America Amazon Logistics Employee Relations Monthly Business Reviews ("NA AMZL ER MBRs") track labor and organizing activity involving DSP drivers. In August 2020, Amazon reported that it had launched a Labor Incident Tracker to "track and trend concerted activity, pro-union behavior and external labor activity," and further reported that Employee Relations was working to incorporate DSP driver metrics into a broader employee relations risk model. In October 2020, the same review series reported that DSP drivers in multiple regions had been approached by external organizers and that Employee Relations was pursuing strategies to reduce risk to Amazon from labor organizing efforts directed at DSP drivers. Amazon supplies the template, materials, and coordination; DSPs deliver the message.

87. Amazon's anticompetitive conduct with respect to unionization follows a typical path. Amazon tracks the potential organizing, brings the routine response, and—if the routine fails—ends the relationship with the DSP. The pattern moves from surveillance to messaging to dissolution. By early 2024, Amazon was running a recurring "[International Brotherhood of Teamsters] Social Update" distributed to Employee Relations leadership that tracked union social-media activity targeting Amazon drivers and associates more broadly.

### 1. Edison, New Jersey: The Threat of Termination

88. At one mandatory workforce meeting in Amazon's Edison, New Jersey delivery station, a DSP owner told workers that organizing could endanger the operation of the DSP. The owner illustrated the point by referencing Amazon's recent decision, as the owner described it, to substantially reduce the package volume Amazon previously routed through UPS, which led to

layoffs at UPS. The clear implication conveyed to workers was that Amazon would not renew a DSP's contract if its drivers organized. The message communicated to workers was that the DSP's continued access to routes depended on avoiding union activity. The Edison warning did not arise in a vacuum: as described below, Amazon formulates anti-union messaging, supplies it to DSPs for delivery to their drivers, and monitors each DSP's delivery of that message. Threatening the end of a DSP's business preserves Amazon's monopsony power.

**2. Queens, New York: Escalation and Termination**

89. Where the routine playbook is unsuccessful in suppressing organizing actions, Amazon turns to escalation tactics. Such tactics are best illustrated by Amazon's treatment of workers at its DBK4 delivery station facility in Queens between January 2024 and August 2025.

90. At the DBK4 location, union organizers built majority support across three DSPs. Drivers delivered a written demand for recognition to Amazon and the DSPs.

91. In November of 2024, Amazon deployed third-party consultants to intimidate the organizers and other prospective union members through proximity and invasion of workspaces. Some consultants wore the safety vests that Amazon issues to its own field staff. The consultants appeared at morning standup meetings, pulled drivers into small-group sessions, and rode along on routes while presenting themselves as operational support. DSP workers understood the consultants were acting on Amazon's behalf. Their presence and surveillance had a chilling effect on DSP workers' exercise of protected labor rights, serving Amazon's purpose to intimidate.

92. On December 19, 2024, at DBK4, approximately 200 workers went on strike, 87 of which worked for the DSP Cornucopia Logistics, LLC. The strike lasted approximately from December 19 until December 24. Ninety-nine percent of workers at the lead organizing DSP voted to strike, and workers at twenty-six driver units across ten Amazon locations demanded recognition that week.

93. In response to the organizing efforts, Amazon also brought a security apparatus to the organizing campaign, including aerial drones overhead, police barricades at the gate, and additional cameras inside the building. The sequence, as workers confirmed, was direct: monitor organizing, deploy consultants, reduce routes, terminate workers, and then terminate the DSP.

94. Amazon refused to increase compensation for DSP services or improve work conditions. Instead, after Christmas, Amazon reduced routes assigned to a DSP at which drivers were successfully organizing. Non-strikers continued to receive routes; strikers were sent home without pay. A week later, the DSP's manager laid off thirty workers, mostly strikers. The DSP told its workforce, in substance, that Amazon had directed the cuts: "Amazon doesn't trust us now" and "Amazon took routes away because you went on strike."

95. The layoffs affected organizing beyond Queens. One Queens DSP also operated at another facility in the same metropolitan area, and workers understood the retaliation at one facility to chill organizing at others.

96. Workers at DBK4 rebuilt support over the next eight months. On August 12, 2025, drivers for Cornucopia raised route-reduction concerns at a standup meeting. Drivers argued to Cornucopia management that the DSP was reducing routes for incumbent employees—including those that had participated in previous strike actions—while continuing to onboard new employees. On August 20, following a typical work day, Cornucopia employees were informed that the DSP's contract had been terminated and that drivers did not need to report to DBK4 on August 21. Amazon cut the DSP's contract with no notice, terminated two of its operations, and redeployed its branded vehicles to other DSPs.

97. According to one employee, the Cornucopia owner stated that the termination "had nothing to do with Cornucopia's quality or safety." Further, in the months preceding the

termination of the contract, Cornucopia managers informed drivers during morning standup meetings that that the DSP was rated "Fantastic Plus" by Amazon, the highest rating for a DSP. Following the contract termination, Cornucopia's manager stated that the "strike was major" in Amazon's determination to terminate the DSP.

98. Amazon also blacklisted individual workers identified as supporting unionization. One worker visible in the campaign was rejected at seven other DSPs in New York and New Jersey. Another found work at a different DSP, which fired the worker within weeks after the manager learned the worker's previous place of employment. A third was hired through a personal referral and then terminated when the manager learned of the worker's prior union efforts.

99. Queens was not an isolated event. The same anti-union messaging appeared across DSPs and facilities. Workers received template text messages in which DSPs occasionally forgot to substitute the correct DSP's name into the template. Similar posters appeared in different locations, and similar scripts were delivered at standup meetings across legally separate DSPs. Independent small businesses do not produce identical messaging at scale by coincidence. The anti-union messaging was formulated and provided to DSPs by Amazon for the purpose of distribution to their drivers.

100. DSPs and their drivers understand that dissolution can be the penalty for defying Amazon.

### B. Amazon Restricts Inter-DSP Competition for Drivers.

101. Collective action is one threat to Amazon's buyer power. Worker mobility is the other. Competition among DSPs for drivers would typically be the likely mechanism to increase wages and other forms of compensation. A DSP needing drivers could offer better pay or better working conditions, inducing workers at other DSPs to either switch employers or use this offer to negotiate a higher counteroffer with their current DSP employer. In either case, that competition

among DSPs would increase wages and/or improve working conditions, which would in turn place competitive pressure on Amazon to pay higher rates for DSP delivery services. Amazon has used its power to constrain that possibility—first through written policy, later through surveillance and enforcement.

### 1. Amazon's No-Poaching Policy.

102. The original DSP Operations Manual, which is—for all practical purposes—binding on DSPs, stated that DSPs "**should not** seek out DAs from other DSPs to offer them an opportunity to join your company (poaching). This practice is frowned upon and may lead to a hostile environment in the station." Further, the Manual urged DSPs to raise concerns about competition for drivers: "If you feel other DSPs are poaching your drivers, you are encouraged to discuss this with the DSP owner or to talk about this with your account manager."

103. In 2020, Amazon made the no-poaching requirement explicitly mandatory: "DSPs or their employees **must not** actively seek out DAs from other DSPs to offer employment opportunities at their company (poaching). This practice is strongly discouraged and may lead to a hostile environment in the station."

104. Preventing competition for DSP drivers was so important that, when DSP drivers did switch of their own accord, Amazon wanted "the original DSP [to] understand that the driver approached [your DSP], and not the other way around." As a result, the policy required the new DSP to tell the prior employer that "the DA had approached another DSP about an opportunity."

105. Amazon personnel applied the rule that way. In October 2020, Amazon told a DSP owner that "solicitation of DAs is clearly not a practice condoned by Amazon" and that credible active solicitation "could impact a DSP's status."

### 2. Amending the Written Policy Did Not Change the Practice.

106. By August 2021, Amazon changed the policy but did little if anything to change the practice. Since 2019, drivers switching among DSPs has remained minimal at best. In some instances, Amazon continued to enforce a no-poaching policy when it learned of DSPs poaching from other DSPs, and DSPs continued to believe no-poach was the operative policy. Amazon was roused to act on the new policy only in rare cases to limit its legal exposure, not to change the practice.

107. Amazon's need to correct its own employees' understanding of the policy on inter-DSP driver recruitment underscores how little Amazon did to change the no-poach practice. In an August 2021 chat, an Amazon manager explained that the manual "used to have specific 'anti poaching' language," but that the language had been removed and replaced with guidance that Amazon "can't restrict movement/recruiting." But the manager added that "the updated policies don't really have any teeth to prevent this."

108. By October 2021, seven months after the manual revision, Amazon field teams were still reaching out to DSPs accused of recruiting drivers from other DSPs at the same station, escalating the issue through contractor relations, and tracking it in operational reports.

109. A year later, an Amazon Business Manager attributed a DSP's poor performance in part due to another DSP poaching drivers with better terms. The Business Manager explained, "I addressed with the poaching DSP and that will not happen again in the future."

110. For years after the supposed policy change, DSPs continued to complain about competition for drivers. In a DSP feedback response, a DSP owner asked Amazon to "stop lazy and underperforming DSPs from poaching my drivers." An October 2022 Amazon hiring report flagged poaching by other DSPs as a barrier to station hiring goals. DSPs still expected Amazon to enforce the rule, and Amazon still tracked the issue.

111. In October 2023, an Amazon Senior Business Coach was still instructing DSPs under his supervision that "no one should ever be approaching other DSP employees in an attempt to recruit them for employment." The norm he had stated, the explicit policy from 2021, was the one he had been taught and was still executing. Two days later, the Amazon Business Coach had to take it back in writing, telling DSPs that "all DSP employees are free to choose the right employer for them." But while Amazon forced the employee to change his message, the formal policy language had changed years ago—yet, tellingly, this Amazon employee serving as the primary contact with the DSP had still understood the policy to be no-poach.

112. Amazon's DSP-owner assessment materials show the same functional policy. One Amazon assessment noted in approximately October 2023 that a DSP had "rubbed multiple other DSPs the wrong way by directly poaching drivers"; another recorded that a DSP blamed Amazon for allowing another DSP to "poach their DAs." Amazon was still treating inter-DSP recruiting as a station problem after it had supposedly prohibited restrictions on driver mobility.

113. Even as recently as 2024, Amazon understood that poaching was still an issue. In September, one Amazon Compliance Manager wrote with respect to potential DSP no-poach agreements, "We have a shared responsibility to mitigate legal risk for Amazon. We need to create a record of Amazon having shut down any conversations among DSPs that could create legal liability for Amazon." This focus on "creat[ing] a record" to "mitigate legal risk" rather than actually protect drivers from restrictive agreements further reveals Amazon's true practices and priorities.

114. Amazon's lethargy in eliminating the no-poach practice pales in comparison to the alacrity with which it enforces other policies—in particular, DSP drivers' attempts to organize. Amazon uses its control over the relationship with DSPs and DSP drivers to identify and quickly

quash any nascent union organizing. When Amazon wants to change a practice or enforce a policy, it does so effectively. In contrast, despite Amazon's protestation that it forbids no-poaches, its lethargic enforcement allowed the practice to continue. Throughout the organization, many Amazon employees and DSPs either were unaware of the change or ignored it. The practice continued through at least 2024, despite the change in formal language.

**VIII. Amazon Has Monopsony Power in the DSP Services Markets.**

115. By its own design, Amazon is the only buyer of last-mile DSP services ("DSP Services Market") offered by the DSPs and holds monopsony power in this market. Direct evidence and its virtual 100 percent share of the DSP Services Market establish its monopsony power.

116. Amazon has targeted the workforce, controlled DSPs' day-to-day operations, prohibited the small businesses that nominally employ the drivers from competing for drivers and providers, surveilled every transfer between those businesses, and terminated any business that resisted or whose employees attempted to resist. Amazon built that buyer power deliberately and defends it deliberately.

117. Both direct evidence and indirect evidence establish Amazon's monopsony power. Evidence that Amazon has suppressed prices (wages, rates, fees) or imposed onerous terms or conditions because of the lack of competitive constraints is direct evidence of monopsony power.

118. Indirect evidence of monopsony means Amazon has substantial market share in a relevant market. In the monopsony context, the relevant market includes the competitive constraints that a buyer faces when purchasing services or labor. It has two components: types of buyers a seller or worker can provide services to (service or labor market) and the area where sellers can provide their services (the geographic market).

### A. Direct Evidence of Amazon's Monopsony Power in the DSP Services Market.

119. Amazon exercises its monopsony power daily. It sets DSP compensation low and controls the DSPs' profit margins. It imposes onerous terms and conditions on DSPs. For example, Amazon can and does terminate DSPs for pretextual or arbitrary reasons, imposes no-poach agreements, and makes it practically impossible for DSPs to serve other customers. Amazon imposes, modifies, and eliminates these terms unilaterally to serve its needs unconstrained by competitive pressures.

120. Amazon enforces its policies through sophisticated monitoring systems, including GPS tracking, in-vehicle artificial intelligence, and cameras surveilling drivers; a network of "business coaches" who "guide" DSPs in implementing Amazon's policies; and surveillance of employee communications outside working hours. These mechanisms enable Amazon to maintain complete operational control while shifting the legal responsibilities of direct employment to the DSPs.

### B. Indirect Evidence of Amazon's Monopsony Power in the DSP Services Markets.

121. The DSP Services Market is a relevant antitrust market and Amazon has monopsony power in that market.

#### 1. DSP Services Are a Relevant Service Market.

122. Delivery Service Partners offer a specific set of services. Amazon is effectively the only buyer of those services. DSPs have few, if any, independent customers; little, if any, independent delivery volume; and no transferable operating infrastructure. They manage and oversee their employees to provide last-mile delivery services for Amazon. By Amazon's design, however, DSPs must satisfy a unique set of services that only Amazon requires. They integrate into Amazon's complex logistics platform.

123. Functionally, a DSP cannot deliver packages for other companies. DSPs may deliver packages for other customers only if they do not use Amazon vehicles or uniforms. The DSP would need a second payroll system and access to the type of services it obtains from Amazon. The DSP would have to duplicate its entire business infrastructure to offer services for companies other than Amazon.

124. Amazon does not worry that a DSP will switch to another company needing last-mile delivery services because no other company has the infrastructure or business model to use DSP services.

**2. New Jersey Is a Relevant Geographic Market.**

125. A Relevant Geographic Market associated with the DSP Services Market is New Jersey. Last-mile delivery is inherently local. The service must take packages from a warehouse and deliver them locally. A DSP simply cannot service a warehouse outside of the DSP's local area, let alone switch its service area in response to a small but significant change in compensation or working conditions.

126. Amazon treats New Jersey as a geographic market. It defines the relevant services pool locally and treats New Jersey-based DSPs and their employees as a distinct group. [redacted] The market for DSP Services is specific to New Jersey, not national. [redacted]—Amazon demands last-mile delivery services from each station to nearby customers.

**3. The New York-Newark-Jersey City Metropolitan Statistical Area (MSA) is a Relevant Geographic Market.**

127. The New York-Newark-Jersey City MSA is also a relevant geographic market. The New York-Newark-Jersey City MSA, defined by the U.S. Office of Management and Budget, comprises 22 counties, including 10 in New York State (coextensive with the five boroughs of New York, the two remaining counties of Long Island, and three counties in the Lower Hudson Valley) and 12 counties in Northern and Central New Jersey. Within the New Jersey portion of the New York-Newark-Jersey City MSA, Amazon operates [redacted] DSPs in this area could not provide those services outside of it.

128. Amazon is also the only buyer of DSP Services in the New York-Newark-Jersey City MSA. The same would be true if the geographic market were national. Because Amazon is the only purchaser of DSP services, however, it would have monopsony power in any defined geographic market. The boundary is not the question; the buyer is.

**4. Amazon's Market Share of DSP Services Market in Both Geographic Markets Establishes Its Monopsony Power.**

129. Within the DSP market, Amazon is a virtual monopsonist with a market share close to 100 percent.

130. Entry barriers make it unlikely that a new company will arise or that an existing one will expand sufficiently to become a meaningful source of potential work for DSPs. Such expansion would require that a company possess both the infrastructure to deliver billions of packages a year and provide the infrastructure that DSPs need to operate. Few, if any companies, possess the size and resources to create such a system.

## IX. Even Under a Broader Market Definition of Last-Mile Delivery Services, Amazon Has Buyer Market Power.

131. Even under a broader, alternative market definition including all last-mile delivery services, Amazon would still have buyer market power. Last-mile delivery services would include any company that delivers packages to a final destination. This alternative service market includes traditional delivery services such as FedEx, UPS, USPS, and similar companies. In this alternative market, Amazon competes for the purchase of delivery services as well.

132. For the reasons described above, the geographic market for last-mile delivery services is New Jersey. But a larger market, even a national one, would not alter this analysis.

133. Within this market, DSP providers still have minimal or no alternatives to selling their services to Amazon.

134. Amazon's substantial market share, even in this larger alternative market, is sufficient to establish market power and is growing. It accounts for 30 percent of the packages delivered nationwide, meaning it purchases nearly 30 percent of all delivery services nationwide. The percentage is likely higher in New Jersey. New Jersey has the third most fulfillment centers in the country behind only California and Texas. Further, New Jersey has the highest per-capita income in the country and is heavily urbanized, conditions which both correlate with high Amazon Prime membership penetration. New buyers of these services, or expansion by existing buyers, are unlikely to arise due to entry barriers.

## X. Amazon Has Buyer Market Power in the Labor Market for DSP Drivers.

135. Amazon's conduct affects both the DSPs as service providers of last-mile delivery services and DSP drivers as workers.

136. In addition to restraining the DSP Services Market, Amazon has also restrained the labor market for DSP drivers through its agreements, policies, and practices that inhibit worker mobility and suppress wages.

137. DSP drivers in New Jersey are a relevant labor antitrust market (referred to as the "DSP Drivers Market"), and Amazon has buyer market power in that market. Both direct and indirect evidence establish Amazon's market power.

### A. Direct Evidence of Amazon's Market Power in the New Jersey Labor Market for DSP Drivers in the Relevant Geographic Markets.

138. Amazon's control of DSPs allows it to control DSP drivers both directly and indirectly. Through its control of the DSPs, it effectively limits driver compensation to rates well below competitive levels. It also subjects DSP drivers to worse conditions than if there were significant competition for the DSP drivers. Amazon assigns routes and sets policies on employment, such as no-poach requirements. Indirectly, the performance requirements and goals effectively control the compensation DSP drivers receive, as well as their working conditions. Further, Amazon is acutely aware of how its policies and actions affect DSP employees. It has little or no worry that it needs to increase compensation and improve working conditions to avoid a significant number of drivers leaving for better opportunities; its primary concern is merely that it might deplete the potential stock of workers willing to work within its system at compensation and conditions that Amazon sets with impunity. As a result of this substantial market power as an employer, DSP drivers receive low wages and suffer poor working conditions much worse than other delivery jobs such as those offered by FedEx, UPS, and USPS.

### B. Indirect Evidence of Amazon's Market Power in the New Jersey Labor Market for DSP Drivers.

#### 1. DSP Drivers Are a Relevant Labor Market.

139. Amazon targets workers with few, if any, viable employment alternatives to Amazon so that Amazon can maintain its buyer power. If employment by other carriers like USPS, UPS, and FedEx were reasonable alternatives for a substantial fraction of DSP drivers, there would not be a gap in pay and working conditions between jobs with those employers and jobs with Amazon DSPs. Amazon DSPs would lose enough workers to these alternative employers so that imposing low wages and poor working conditions would be unprofitable.

140. A 2021 Amazon market-intelligence plan described the "consumption of labor" as a "sustainability challenge." Amazon focuses on workers for which the number of hours offered (or purchased in the Services Market) is a primary focus. Not only does Amazon offer lower wages in exchange for the guarantee of 40-hour work weeks, but its DSP drivers are unlikely to see jobs with unpredictable hours as reasonable alternatives. Amazon further intended to "[m]aximize labor pool penetration of Golden Associate Profile Segments who are longest-retaining through targeted marketing." The "Golden Associate Profile" was Amazon's label for the target DSP driver. For DSP drivers, other employment opportunities are not similar. They lack the qualifications to drive for traditional delivery services, and gig work does not provide the certainty of hours that being a DSP driver provides.

141. Amazon, based on its own documents, does not consider gig work to be a comparable substitute for DSP employment. [redacted]

### 2. New Jersey and the New York-Newark Jersey City MSA Are Relevant Geographic Markets.

142. For the same reasons that New Jersey and the New York-Newark-Jersey City MSA are appropriate geographic markets for analyzing competition for DSPs, they are also the relevant geographic markets for analyzing competition for DSP drivers.

143. [redacted]

### 3. Amazon's Market Share in the DSP-Drivers Labor Market Establishes Its Market Power.

144. Entry barriers make it unlikely that a new company will arise or that an existing last-mile delivery service providers will expand sufficiently to become a meaningful option for Amazon's DSP drivers because, as described above, it is unlikely a company will develop a DSP-like system. As a result, Amazon is a virtual monopsonist in this geographic market and has a market share far exceeding the threshold for market power.

145. Amazon would still have buyer market power in a relevant market that includes all employers of last-mile delivery drivers in both relevant geographic markets.

## XI. Amazon's Conduct Has Many Anticompetitive Effects and Continues to Have Ongoing Impact.

146. Amazon's multifaceted campaign to improperly maintain its monopsony power has resulted in numerous anticompetitive effects. First, DSP drivers' wages have been artificially constrained below competitive levels (also referred to as "sub-competitive wages"). If drivers were permitted to unionize in the absence of Amazon's conduct, wages would increase to a more competitive level. This exact outcome occurred when UPS drivers secured higher wages and better working conditions as a result of their Teamsters membership.

147. Amazon's policies and practice with respect to "poaching" have also contributed to sub-competitive DSP driver wages. The no-poach policy, or a practical policy to that effect, chills DSPs' incentives to offer higher wages or better working conditions than other DSPs because such a DSP would likely have to report on those efforts through the mandated interactions with other DSPs. The result is the situation we see today: DSPs generally do not actively seek to distinguish themselves from other DSPs to prospective drivers on the basis of pay or other compensation. If DSPs were incentivized to meaningfully compete with one another on wages and other forms of compensation such as health benefits, DSP driver compensation terms would likely improve.

148. In addition, Amazon's anticompetitive conduct has maintained its ability to subject DSP drivers to sub-competitive working conditions and invasive surveillance.

149. Amazon's conduct has also chilled DSP drivers' ability to organize. Drivers have declined union activity because they feared losing their jobs, union supporters have been unable to obtain work at other DSPs, and at least one driver avoided a union rally because she feared retaliation and believed Amazon might terminate her new DSP's contract if organizing resumed.

150. Amazon's anticompetitive conduct has also maintained its ability to unilaterally, and often without notice, set the requirements it imposes upon DSP drivers, such as termination

for trivial traffic violations or any other reason, such as attempted unionization. DSP managers know that Amazon itself can functionally terminate drivers by locking them out of the Flex App, based on rules that Amazon unilaterally sets. In the absence of Amazon's anticompetitive conduct, such draconian working conditions would not likely be in place.

151. Amazon's anticompetitive conduct harms DSPs, as well, by depriving them of meaningful independence and fair compensation. Amazon exercises substantial control over DSPs, unilaterally imposing onerous terms that dictate both compensation rates and route assignments, thereby effectively dictating each DSP's income. Through the DSP scorecard—the mechanism governing route allocation and compensation—Amazon forces DSPs to balance incompatible demands, like driver safety and unrealistic delivery expectations, while offering no meaningful avenue to challenge their scores. At the same time, DSPs remain captive entities with no reasonable alternative buyers of their services beyond Amazon and facing a substantial risk of termination if they step out of line with Amazon's rule, policies, or practices.

152. Amazon's own documents confirm the anticompetitive effects its conduct has created. Its local labor market analyses show Amazon continues to pay lower wages than other employers in the market. By maintaining its monopsony, it has been able to dictate DSP staffing, route assignments, and compensation to reduce the hours and pay available to drivers. Amazon maintains its ability to set key compensation terms and controls the revenue and work available to DSPs. As a follow-on effect, Amazon's conduct has limited DSPs' ability to compete for drivers through higher wages, more reliable hours, or better working conditions.

153. Amazon's documents further confirm that it was aware that its practices caused unstable work, inadequate compensation, worker attrition, and loss of DSP independence. Indeed, DSP owners reported these harms to Amazon directly in its own experience surveys — describing

being "asked for more without compensation" and "[t]oo much control by Amazon regarding daily operations," leaving owners feeling like "glorified managers."

154. This Court's intervention is necessary to lessen, if not eliminate, these anticompetitive effects resulting from Amazon's conduct.

## XII. Causes of Action

### **Count I: Monopsonization of the DSP Services Market in Both Relevant Geographic Markets under Section 2 of the Sherman Act**

155. New Jersey incorporates the allegations of paragraph 1 through 154 above.

156. Amazon has monopsony power in the DSP Services Market in NJ and in the New York- Newark-Jersey City MSA.

157. Amazon has willfully monopsonized the DSP Services Markets through a multifaceted scheme including the anticompetitive acts described herein. Each of Amazon's actions individually and collectively increased, maintained, or protected its DSP Services monopsony.

158. Amazon's anticompetitive acts include, but are not limited to, practically preventing DSP drivers from forming unions through various mechanisms, such as the use of contractual provisions that restrict the means critical to unionization, as well as the use of threats and intimidation. When these anticompetitive efforts are not entirely "successful," in that they do not eliminate the prospect of unionization, Amazon will resort to terminating its business relationship with a DSP and/or taking adverse action against the drivers who threatened Amazon's monopsony power.

159. Amazon has also restricted DSPs' ability to compete, in terms of compensation or other benefits, for the services of DSP drivers who provide the best service or otherwise wish to avail themselves of a better working situation. This also serves to maintain Amazon's monopsony

power, because it eliminates the potential that one or more DSPs will become indispensable or critical to Amazon, and thus may be able to partially constrain Amazon's monopsony.

160. While each of Amazon's acts is anticompetitive, Amazon's interrelated actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process for the DSP Services Market. Amazon's anticompetitive scheme has had harmful and disturbing effects on both DSPs and DSP drivers.

**Count II: Attempted Monopsonization of the Last-Mile Delivery Services Markets in the Relevant Geographic Markets Under Section 2 of the Sherman Act (In the Alternative)**

161. New Jersey incorporates the allegations of paragraph 1 through 160 above.

162. In the alternative, if the relevant service market is Last-Mile Delivery Services, Amazon has unlawfully attempted to monopsonize those alternative markets in violation of Section 2 of the Sherman Act. The sale and purchase of last-mile delivery services in New Jersey and the New York-Newark-Jersey City MSA are relevant antitrust markets.

163. Amazon has willfully attempted to monopsonize the Last-Mile Delivery Services Market through a multifaceted scheme including the anticompetitive acts described herein.

164. In undertaking this course of conduct, Amazon has acted with specific intent to monopsonize and to destroy effective competition in the Last-Mile Delivery Services Market.

165. There is a dangerous probability that, unless restrained, Amazon will succeed in monopsonizing the Last-Mile Delivery Services Market. Amazon has grown dramatically in this area and will soon be the largest buyer of last-mile delivery services.

**Count III: Unreasonable Restraint of Trade in the DSP Services Market in the Relevant Geographic Markets Under Section 1 of the Sherman Act**

166. New Jersey incorporates the allegations of paragraph 1 through 165 above.

167. The DSP Services Market in New Jersey and in the New York-Newark-Jersey City MSA are relevant antitrust markets. In both of those markets, Amazon has buyer market power.

168. Amazon enters into agreements with DSPs, and a core purpose and effect of those agreements is to restrain competition in the DSP Services Market. As discussed above, Amazon's agreements with DSPs include anticompetitive terms, including: at-will employment requirements, non-solicitation requirements that purposely hinder workers' ability to unionize, and no-poach requirements.

169. Upon information and belief, Amazon's agreements and coordinated efforts with DSPs are not all written.

170. Amazon specifically chose to implement a contract and policy-based system with respect to DSPs. Amazon steadfastly claims that DSPs and its drivers are "independent," but as discussed above, Amazon maintains incredible control over them. This control is achieved, at least in substantial part, through the agreements and coordinated efforts it executes with respect to DSPs, who are captive to Amazon's control.

171. Amazon's anticompetitive agreement terms have had a cumulative and self-reinforcing effect that has harmed competition, including other buyers of last-mile delivery services the competitive process for the DSP Services Market. The agreements unreasonably restrain trade. Amazon's anticompetitive scheme has had harmful and disturbing effects on DSPs and DSP drivers, including both monetary and non-monetary harms.

**Count IV: Unreasonable Restraint of Trade in the DSP Drivers Labor Market in the Relevant Geographic Markets Under Section 1 of the Sherman Act – No-Poach**

172. New Jersey incorporates the allegations of paragraph 1 through 171 above.

173. Amazon's practical no-poach policy is an agreement for the purposes of Section 1 of the Sherman Act and unreasonably restrains trade.

174. Amazon has monopsony power in the relevant markets.

175. Amazon enters into contractual agreements with DSPs that require adherence to formal policies and informal patterns and practices. One of these policies has been a prohibition against poaching drivers from other DSPs, in effect coordinating an agreement not to compete among direct competitors in the labor market. This restraint began no later than in 2020 and, as early as 2018.

176. Despite public protestations that it prohibits no-poach agreements among its DSPs, the practice continues. Amazon continued to enforce the policy past the change in its official policy language, knows that practice continues, and has taken minimal and otherwise insufficient steps to end it.

177. Amazon's practical no-poach policy has harmed competition and the competitive process in both relevant markets and is an unreasonable restraint of trade. Amazon's anticompetitive no-poach agreement has injured DSP drivers, including both monetary and non-monetary harms.

**Count V: Violations of the New Jersey Antitrust Act**

178. New Jersey incorporates the allegations of paragraph 1 through 177 above.

179. As discussed herein, Amazon engaged in numerous commercial practices that violate the New Jersey Antitrust Act, N.J. Stat. Ann. §§ 56:9-1 to -19, including:

a. monopsonizing or attempting to monopsonize the DSP Services Market or the alternatively pled Last-Mile Delivery Services Market within the State of New Jersey, in violation of N.J. Stat. Ann. § 56:9-4;

b. unreasonably restraining trade in the DSP Services Market or the alternatively pled Last-Mile Delivery Services Market within the State of New Jersey, in violation of N.J. Stat. Ann. § 56:9-3; and

c. unreasonably restraining trade in the DSP Drivers labor market, in violation of N.J. Stat. Ann. § 56:9-3.

176. Each violation of the federal antitrust laws by Amazon also constitutes a separate unlawful practice and violation of the New Jersey Antitrust Act under N.J. Stat. Ann. § 56:9-16.

## XIII. Prayer for Relief

177. Plaintiff respectfully requests that this Court, as authorized by statute and its own equitable powers, enter final judgment against Amazon and:

a. Adjudge and decree that Amazon has acted unlawfully to monopsonize the DSP Services Market, or, in the alternative, attempted to monopsonize the Last-Mile Delivery Services Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, as well as the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-4;

b. Adjudge and decree that Amazon's DSP agreements and other related combinations constitute unreasonable and unlawful restraints of trade in violation of Section 1 of the Sherman Act as well as the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-3;

c. Adjudge and decree that Amazon's no-poach agreements constitute an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act as well as the New Jersey Antitrust Act, N.J. Stat. Ann. § 56-9-3;

d. Enjoin and restrain Amazon, its affiliates, assignees, subsidiaries, successors, and transferees, and its officers, directors, partners, agents and employees, and all other persons acting or claiming to act on Amazon's behalf or in concert with it, from continuing to violate the Sherman Act and the New Jersey Antitrust Act;

e. As needed, enter such relief to remove any ability of Amazon to harm competition by the actions set forth above, including but not limited to structural relief as well as

effective, monitorable, and measurable conduct remedies that eliminate the ability of Amazon to continue to reap benefits from their pattern of harm;

f. Appoint a corporate monitor to ensure implementation of all structural or practice remedies ordered by the Court, as well as to ensure that Amazon does not engage in further unlawful conduct, at Amazon's expense;

g. Award to Plaintiff any other equitable relief as the Court finds appropriate to redress Amazon's violations of the laws specified above and to restore competitive conditions in the markets affected by Amazon's unlawful conduct and deprive Defendants of any advantages from their unlawful acts;

h. Award to Plaintiff the maximum civil penalties as provided by the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-10;

i. Award to Plaintiff actual damages, statutory damages as parens patriae, punitive damages, treble damages, refunds of moneys acquired by means of unlawful commercial practices, and any such other relief as provided by the Sherman Act, Clayton Act, and the New Jersey Antitrust Act;

j. Award pre-judgment and post-judgment interest on such monetary relief;

k. Award to Plaintiff statutory or equitable disgorgement, restitution, or any other equitable relief for the benefit of New Jersey DSPs and DSP workers, as appropriate under the federal antitrust laws and the New Jersey Antitrust Act;

l. Award to Plaintiff its costs, including reasonable attorney fees; and

m. Order any additional relief that this Court deems just and proper.

## XIII. Demand for Jury Trial

Plaintiff hereby demands a jury trial on all issues so triable.

DATED: October 1, 2026

Respectfully Submitted,

JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY

*/s/ David Reichenberg*
David Reichenberg (NJ Attorney ID 507282024)
Deputy Attorney General
Section Chief, Antitrust Section
David.Reichenberg@law.njoag.gov

Brian F. McDonough (NJ Attorney ID 026121980)
Assistant Attorney General
Brian.McDonough@law.njoag.gov

Yale Leber (NJ Attorney ID 207732017)
Deputy Attorney General
Antitrust Section
Yale.Leber@law.njoag.gov

Samuel Kontos-Bleifer (NJ Attorney ID 431132023)
Deputy Attorney General
Antitrust Section
Samuel.Kontos-Bleifer@law.njoag.gov

**OFFICE OF THE NEW JERSEY ATTORNEY GENERAL**
**DIVISION OF LAW**
124 Halsey Street, 5th Floor
Newark, NJ 07101
Telephone: (609) 696-5271

*Attorneys for Plaintiff*

Michael Kades (admitted *pro hac vice*)
Brian L. Moore (admitted *pro hac vice*)
Benjamin Notterman (NJ Attorney ID 510572025)
Jeff Dan Herrera (admitted *pro hac vice*)
Erin Lyman (admitted *pro hac vice*)

**NACHAWATI LAW GROUP**
5489 Blair Road
Dallas, TX 75231
Telephone: (214) 890-0711
mkades@ntrial.com
bmoore@ntrial.com
bnotterman@ntrial.com
jherrera@ntrial.com
elyman@ntrial.com

*Attorneys for Plaintiff*